# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 16, 2003 Session

## DAYNE SCOTT O'BANNON v. STEPHANIE SUE GRABLE O'BANNON

**Appeal from the Circuit Court for Bradley County**
**No. V-98-642     John B. Hagler, Judge**

**FILED NOVEMBER 20, 2003**

**No. E2002-02553-COA-R3-CV**

---

This appeal from the Bradley County Circuit Court questions whether the Trial Court erred in denying the Wife's proposed relocation to South Dakota and in changing custody of the parties' children from Wife to Husband. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM H. INMAN, S.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

Gregory Scott Kanavos and Henry Franklin Chancey, Cleveland, Tennessee, for the Appellant, Stephanie Sue Grable O'Bannon

Kimberlee A. Waterhouse, Lenoir City, Tennessee, for the Appellee, Dayne Scott O'Bannon

## OPINION

The parties were divorced by final decree entered March 22, 1999 which incorporated a marital dissolution agreement providing Wife should have custody of the parties' two minor children - Amy, born February 26, 1995, and Grace, born August 6, 1996,- and that Husband should have liberal visitation.

After Husband received a certified letter from Wife in which she stated her intention to relocate to Spearfish, South Dakota, with the parties' children, he filed a petition to oppose the relocation and to modify custody. While the petition was pending, Husband filed a motion for immediate temporary custody which was prompted by the parties' youngest daughter having been attacked by a dog belonging to Wife and Paul Riddle, her new husband. The dog was destroyed shortly after the attack at the instruction of Mr. Riddle and the motion for temporary custody was denied with the caveat that the episode would be explored further at the plenary hearing.

A final hearing on the issues of relocation and modification of custody was held in March, 2002. Wife's request to relocate was denied upon findings that (1) the relocation does not have a reasonable purpose, (2) the relocation "poses the threat of specific and serious harm to the children which would outweigh the threat of harm of a change of custody" and (3) "that the motive for the proposed move is vindictive in that it is intended to defeat or deter [Husbands'] visitation with the children." Custody of the parties two children was changed to Husband based upon a finding of "substantial and material change of circumstances." Wife's motion to reconsider filed thereafter was denied and this appeal followed.

Wife presents for review the issues of whether (2) the court erred in denying the request to relocate, and (2) in changing custody of the children.

Our standard of review in this non-jury case is *de novo* upon the record of the proceedings below and there is no presumption of correctness with respect to the Trial Court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996) and T.R.A.P. 13(d). The Trial Court's factual findings are, however, presumed to be correct and we must affirm such findings absent evidence preponderating to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn. 1993).

## The Relocation Issue

We first address the issue of whether the trial court erred when it denied Wife's request to relocate with the children.

T.C.A. 36-6-108(d) provides that the parent spending the greater amount of time with the child will be allowed to relocate unless:

> (1) The relocation does not have a reasonable purpose;
> (2) The relocation would pose a threat of specific and serious harm to the child which outweighs the threat of harm to the child of a change of custody; or
> (3) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

The thrust of Wife's testimony is that she wishes to relocate to Spearfish, South Dakota because that is her native home and all her relatives live there. She contends that she could find employment there "within thirty seconds" and that her new husband's prospects for finding work there would be "excellent." The trial judge found that the best reason the mother gave for the relocation was that she had had a troubled relationship with her own mother and she wanted to go back "to where she was so she could rehabilitate that relationship", and "the Court finds it very strange that a parent would wait to rehabilitate her relationship with her adult parent at the expense of the children's relationship with their parent."

We do not agree that the fact that Wife is originally from Spearfish, South Dakota and that her mother and other relatives live there is sufficient to establish that her intended relocation has a reasonable purpose and justifies moving these children fifteen hundred miles from their father. Furthermore, the Wife's argument that relocation will afford  better job opportunities is not sufficiently supported by the evidence. Wife testified that, although she does not have a job awaiting her in Spearfish, her intent is to open an insurance agency there.  Her current husband testified that he has made no effort to find employment in Spearfish but believes he would be able to do so. Doubtless relocation because of a better job opportunity, greater salary, and career advancement opportunities, establishes a 'reasonable purpose' within the meaning of the statute, but mere belief and hope that career advancement will occur is not sufficient to establish a reasonable purpose for relocation. Wife cites several cases on which she relies to support her argument that her intended relocation has a reasonable purpose because of job opportunities, but in each case the party seeking relocation, or the spouse of such party, had either an actual job or offer of  employment in the area of proposed relocation

In contrast to the uncertain employment future they face in Spearfish, both Wife and her current husband  have stable employment in this area . Wife testifies that she has been employed at a local funeral home for two years and that she earned $31,000.00 during the year preceding trial. Mr. Riddle testifies that he has been employed as an automobile salesperson for fifteen years and would be making between $35,000.00 and $40,000.00 during the year of trial. Mr. Riddle also testifies that he realizes income from renting mobile homes, mobile home lots and houses in the area. Under these circumstances we agree with the Trial Court's determination that Wife's request to relocate is without reasonable purpose.

Wife's announced reason for the proposed move to Spearfish is to reunite with her mother with whom she had a poor relationship.  She presently visits her mother in Spearfish almost yearly and her mother and step-father travel to Tennessee every year.  Her husband, Paul Riddle, has no connections to South Dakota, and has no reason for the proposed move, but is passively going along with his wife.  As stated, both have lucrative employment in Bradley County where Paul Riddle has substantial investments.  The thrust of testimony offered about what they would do, if permitted to move, is essentially a vague plan of what they might do rather than a clear purpose for relocating. The trial judge noted that the real motivation for wanting to move is likely the scandal resulting from the breakup of Paul and Tina Riddle's marriage, caused by, according to Tina, the Respondant.  The trial judge further found:

> Now, leave that there just for a minute, and then look at some of the other things that the mother was doing prior to this removal. She was telling people, and - - it's a finding of fact by the Court that she told people, that the father was a pedophile.  There is no question about that.  And she admitted it to the father.  I misstated that in court.  She didn't admit it in court.  She admitted it to the father and I accredited his testimony.

-3-

She said he wasn't a pedophile, so why would she say that? Well, I think possibly, in getting ready for an unreasonable removal of the children, to give people an explanation of why she was moving out of this area, because this father was so terrible. He was a pedophile. He had raped her. And she changed that somewhat in court, but she certainly made statements that would give people the impression that he raped her. She said that he caused them to engage in sex in front of the children. She said he was a pornographer. It appeared to the Court that all of these things were done in preparation to make this move reasonable. I think a parent who would say - - make those slanderous remarks about another parent has really put his or her fitness as a parent in question.

Now, there is no evidence that any of this directly affected the children, but there's plenty of evidence that it would indirectly affect the children, because if her feelings about the father were this great, it would be very difficult for that not to spill over to the children. And it would be a matter of time before the children would ask the father what a pedophile was, because the word was being spread around. And there was no indication that there was any attempt being made to recall this.

And it was those things that, not only were material changes of circumstances, in the Court's opinion, but were also evidence of vindictiveness with respect to the planned move. And following the statute and the father's pleading the Court had to go into consideration of custody because of the material change of circumstances.

In *Kornblee v. Kornblee*, 2001 WL 109385 (Tenn. Ct. App.)[no perm. app. filed], the mother after receiving an objection to her request to relocate, embarked on a mission to try to limit father's access to the children and require supervised visitation. To that end, the mother asserted allegations that the father was physically and sexually abusive to the children. The allegations proved to be groundless and this court found that, "Given the vindictive spirit displayed in the record by Mrs. Kornblee, the trial court did not err in refusing to allow the children to relocate to Wyoming and in declining to restrict the visitation of the children with their father to supervised visitation."

We cannot find that the evidence preponderates against the judgment denying relocation. Rule 13(d) Tenn. R. App. P.

<u>The Custody Issue</u>

We next address Wife's argument that the Trial Court erred in changing custody of the parties two children to Husband.

In a recent opinion, *Cranston v. Combs*, 106 S.W.3d 641,644 (Tenn. 2003), the Supreme Court discussed the two step process that a court is required to engage in before making a determination as to the propriety of modifying custody:

> First, the court must determine whether a material change in circumstances has occurred after the initial custody determination. Although there are no bright-line rules for determining when such a change has occurred, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2)whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way. (Citations omitted).
>
> Second, after finding that a material change in circumstances has occurred, the trial court must determine whether modification of custody is in the child's best interests using the factors enumerated in Tennessee Code annotated section 36-6-106 (2001). These factors include:
> (1) The love, affection and emotional ties existing between the parents and the child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . ;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
> (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . ;
> (9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and
> (10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.
> Tenn. Code Ann. § 36-6-106.

In short, the statutory scheme and our decision in *Kendrick* provide a flexible framework within which a trial court may consider a number of factors in determining whether to modify a custody decree. Although evidence of substantial harm or harm to the child is certainly relevant to the trial court's determination, the analysis to be applied under *Kendrick* does not require a finding of harm or substantial harm to establish a material change in circumstances.

In *Gaskill v. Gaskill*, 936 S.W.2d 626 (Tenn. Ct. App. 1996) we held:

Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they must still base their decisions on the proof and upon the appropriate application of the applicable principles of law.

In determining that there has been a material change in circumstances in this case, the Chancellor found that Wife "has had instances of extreme instability, that her current marriage is not stable, that [she] has made bad decisions and judgments concerning the children and these findings along with other findings in regard to the relocation require a change of custody." The Chancellor noted various incidents which compelled him to conclude that there was a material change in circumstances warranting a change of custody in this case. We note two of the incidents referenced by the Chancellor and find that they do constitute material changes which satisfy the three criteria designated in *Cranston, ibid*.

First, we note the incidence of the previously referenced dog attack upon Grace, the parties' youngest child. This matter occurred after the entry of the divorce decree awarding Wife custody and was not an event reasonably anticipated at that time. The dog, which belonged to Mr. Riddle, was a German Shepard weighing approximately one hundred pounds. The attack occurred while both of the parties' children were in the care and control of Wife and Mr. Riddle and left Grace with head wounds which necessitated emergency room treatment, required twenty one stitches and left permanent scars. At the time of the attack the dog was unrestrained with respect to the children despite the fact that, as Wife and Mr. Riddle were aware, the dog had previously attacked two other children. Although Amy was not physically injured as a result of the attack she was in close proximity and witnessed the attack on her sister. It is self evident that this event affected the well being of these children in a meaningful way.

Second, evidence fully credited by the Chancellor was presented showing that Wife stated to others that Husband was a pedophile and that he had raped her. These statements were made after the divorce decree which awarded Wife custody and at that time it could not have been reasonably

anticipated that she would make such statements. Wife does not dispute the falsity of these statements and Husband testified that when he asked her why she made them she responded that it was *because of her hatred for Husband*. We agree with the Chancellor's analysis that "if her feelings about the father were this great, it would be very difficult for that not to spill over to the children." Furthermore, false allegations of sexual misconduct, particularly pedophelia, will cause serious damage to an individual's reputation in the community and have an undeniable negative affect upon a parent's relationship with his or her child. Accordingly, we find that the making of these vicious statements by Wife adversely affected the well being of the parties' children in a meaningful way, and revealed her relative unsuitability to have primary custody of the children.

The marriage of Wife to her present husband, Paul Riddle, had its foundation in an affair between Wife and Mr. Riddle [who was married to Tina Riddle] which began after Wife's divorce from Husband. After their marriage Wife and Mr. Riddle have separated twice - once for two months - and they were in marriage counseling as recently as five to six months prior to trial. The instability of Wife's current marriage is directly related to T.C.A. 36-6-106(4) - "[t]he stability of the family unit of the parents" - and is a proper ground for modification of custody. The Chancellor found "that an affair with a married person is sign of instability in your relationships, and she [Wife] appeared to blame that on the father in this case, and as the terrible marriage she had with him as the reason she was having an affair with someone else."

We take note of the Chancellor's findings with regard to the circumstances of the dog attack on the parties' older child heretofore referenced. The Court found this to be evidence of Wife's poor judgment[1] and this finding is pertinent to T.C.A. 36-6-106(10) - "[e]ach parent's past and potential for future performance of parenting responsibilities...." The Chancellor also found with respect to the dog bite incident that Wife did not notify Husband that his daughter had been attacked and injured until she had returned home from the hospital. Wife's failure to notify Husband as soon as practicable that his child had sustained injuries requiring emergency medical treatment is further directly related to another factor set forth at T.C.A. 36-6-106(10) - "the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent consistent with the best interest of the child." The evidence does not preponderate against these findings which are supportive of the Court's determination that a modification of custody is in the best interest of the children.

As primary caregiver since the divorce, Wife emphasizes the importance of continuity of placement in the lives of the children. We acknowledge the importance of continuity of placement and the stability it brings. However, as we stated in *Gaskill, ibid.* page 630:

> Continuity ... does not trump all other considerations. Depending on the facts, a parent who has been a child's primary caregiver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child.

---

[1] Strangely enough, Wife seemingly was somewhat protective of the dog.

Wife contends that, if the Trial Court found a material change in circumstances, it was further required to conduct a best interest analysis to determine whether placement with either party over the other was in the best interest of the parties' children. Wife argues:

> A careful review of the record indicates that the Trial Court did **no** analysis of the Father's circumstances, his living arrangements, or his general ability to care for or meet the day to day needs of Amy and Grace. In fact, at the conclusion of the March 20, 2002 hearing in this cause, Mother's trial counsel attempted to remind the Trial Court that at that time, the Father lived in a small house or apartment that did not even have a separate bed for these children. ... To which the Trial Court responded *"You all work on your parenting plan and if you have an objection to Mr. Bannon's place to care for his children and if he cannot come up with a suitable place then I will hear you."* (Emphasis in original.)

Wife argues that had the Court conducted such further analysis it would have determined that it was in the children's best interest that they remain with their mother.

It is conceded that both Husband and Wife love these children and that the children love their parents. We further note that, in his opening argument at trial, Wife's counsel conceded that Husband "is, for all intensive [*sic.*] purposes, a good father." Wife also conceded in her testimony that, aside from his discussion with the children of matters relating to her relocation that she felt were "too adult for them to understand", Husband is a good father. The only evidence in the record regarding Husband's living accommodations is his testimony:

> SK: It's true, is it not, that as we sit here today, you still live in the same one bedroom house that you lived in when we first filed this action?
>
> DO: That is correct.
>
> SK: And it's the same one bedroom house that you were living in in March, when we did this deposition.
>
> DO: That is correct.
>
> SK: And did you bring any photographs of this house so we could show the judge exactly how small it is?
>
> DO: No. No, I did not.
>
> SK: Well, is it your plan, if you get custody of these girls, to - to move them into this small house with you and then move them out -

DO: Absolutely not. Absolutely not. On top of what I pay in child support I could afford a very nice house.

We find nothing in this testimony, or in the record otherwise, which warrants the conclusion that the house referred to would offer inadequate accommodation for the children. We also note that, after the Court's offer to hear any objection Wife might have to Husband's residence or his inability to provide a suitable residence for the children, no objection was made by Wife nor did she raise the matter of Husband's living accommodations at the August 22, 2002, hearing on her motion to rehear. Given the protractive and acrimonious nature of this case we deem it appropriate to summarize the Chancellor's findings respecting a change in custody:

a.  Mrs. Riddle's vindictiveness and shocking behavior telling others that Mr. O'Bannon was a pedophile. The overwhelming proof that she did this and that she did so "during the throes of a period in which she was trying to protect herself."

b.  The slanderous remarks made by Mrs. Riddle, including that Mr. Riddle was a pedophile, a rapist, a pornographer and that he caused them to engage in sex in the presence of the children which really put her fitness as a parent in question. She used this tactic to make her proposal to move seem reasonable.

c.  The instability of her current marriage, and in her life since the divorce, including her affair with a married man.

d.  Her bad judgment in allowing one of her boyfriends to stay overnight (while the children were present) and even when the boyfriend seemed a bit put aback by her conduct.

e.  The infamy of the breakup of Tina and Paul Riddle's marriage as being her real motivation for the proposed move to South Dakota.

f.  The strong evidence of her intention to defeat or deter Mr. O'Bannon's time with the children where it is evident that it was in the children's best interest to permit more and liberal time for the children to be with their father.

g.  The dog bite episode which "evinces just incredibly bad judgment to have a dog that had attacked two other children and then keeping that dog until it attacked the third child."

h.  That Mrs. Riddle did not bother to notify Mr. O'Bannon about the dog attack on Grace until after the child returned from the hospital. She did not advise the children's father early enough in this very significant incident in the life of the child.

i.        That her proposed relocation had no reasonable purpose except for convenience, i.e. to be around her mother and to avoid social consequences of her role in the breakup of the marriage of Tina and Paul Riddle.

To the extent the Chancellor did not make specific findings by format with respect to the comparative fitness of Husband and Wife, such omission was harmless error and does not constitute a ground for reversal in this case.

The judgment of the Trial Court is affirmed and costs of appeal are adjudged against Wife.

_____
WILLIAM H. INMAN, SENIOR JUDGE